[Cite as *State v. Murphy*, 2023-Ohio-4825.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-18 |
| | : | |
| v. | : | Trial Court Case No. 22-CR-0405 |
| | : | |
| VERLYNIA MURPHY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 29, 2023

. . . . . . . . . . .

THOMAS W. KIDD, JR., Attorney for Appellant

ROBERT C. LOGSDON., Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Verlynia Murphy appeals from her convictions for failure to stop after an accident and reckless homicide.   We conclude that Murphy's conviction for failure to stop was not supported by sufficient evidence and was against the manifest weight of the evidence.   Murphy's car left the public roadway, struck a utility pole, and came to rest in the roadway; she then left the scene without her vehicle.   Murphy was not involved in a

motor vehicle accident or collision with persons or property upon a public road or highway. The fact that a driver of another vehicle later was fatally injured after striking Murphy's unoccupied vehicle in the roadway did not bring the matter within the ambit of R.C. 4549.02(A), which is addressed to the exchange of identification and vehicle registration between parties to an accident or collision. As such, Murphy's conviction for failure to stop is reversed, and we will remand this matter to the trial court for it to issue an amended judgment entry that reflects the reversal of this conviction and the related driver's license suspension. Because we reverse the conviction for failure to stop, we need not address Murphy's argument that her two sentences should have been imposed consecutively.

## PROCEDURAL HISTORY

{¶ 2} Murphy was indicted on May 10, 2022, for failure to stop and reckless homicide. Before trial, Murphy moved to dismiss the charge of failure to stop, which was a third-degree felony due to the death of the other driver, and to substitute the charge with failure to stop after an accident involving the property of others in violation of R.C. 4549.03, a misdemeanor of the first degree. The trial court overruled the motion, finding that the court lacked charging authority. Following a jury trial, Murphy was found guilty of both offenses. The court sentenced her to an aggregate term of 4½ years in prison, which included consecutive sentences, and suspended her driver's license for three years.

## ASSIGNMENTS OF ERROR AND ANALYSIS

{¶ 3} Murphy raises two assignments of error. Her first assignment states:

THE EVIDENCE WAS INSUFFICIENT AS A MATTER OF LAW

AND/OR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO SUSTAIN MS. MURPHY'S CONVICTION.

{¶ 4} At trial, Deputy Joe Liming testified that on July 25, 2021, he was a deputy sheriff in New Carlisle assigned to road patrol, and he was dispatched to Schiller Road, a two-lane country road, around 3:15 a.m. on a report of a two-car crash. Liming stated that there was torrential rain at the time. When he arrived at the scene, medic units and a fire engine were present with lights flashing. Liming observed an unoccupied Ford SUV that had crashed into a telephone pole; he also saw a red pickup truck in a nearby ditch that was filled with water. The driver of that vehicle was still in the driver's seat and had drowned. Liming identified Murphy as the registered owner of the SUV, and he proceeded to her address around 5:40 a.m. Murphy told Liming that she had arrived home around 1:15 a.m. and had gone to bed. Body camera video of what Liming saw at the scene of the accident and of his encounter with Murphy were presented at trial.

{¶ 5} Ohio State Highway Patrol Trooper Robert Sabo testified that he responded to the scene on Schiller Road around 3:48 a.m. on July 25, 2021, during a "very heavy downpour." He stated that Schiller Road lacked any lighting, and he identified photographs from the scene which depicted the SUV, the utility pole that it struck, a portion of the pole and attached wires that were next to the SUV on the ground, and the pickup truck "down in the creek." The photos showed that the airbag in the SUV had deployed. According to Sabo, Schiller Road runs east and west, the SUV was struck from behind by the pickup truck, and the pickup truck left the roadway on the south side of the road.

{¶ 6} Sabo further identified photographs of the vehicles taken during daylight hours, after the pickup truck was removed from the creek. Sabo stated that the pickup truck had been travelling eastbound and sustained the heaviest amount of damage to the front end of the truck; other small dents and scratches were related to its course of travel off the roadway into the creek. The pickup truck "only had one impact," which was with the SUV, but the SUV "had two impacts because it had damage to both the front and rear of the vehicle." Photos depicted "a red piece" of the pick-up truck in the middle of the rear bumper of the SUV.

{¶ 7} Trooper Sabo stated that security camera footage was obtained from a nearby business, recorded from 2:00 a.m. to 4:00 a.m., and portions of that video were played for the jury. Sabo testified that the "first crash" occurred around 2:41 a.m., when the SUV travelling westbound on Schiller Road struck a utility pole and spun around such that its headlights were pointed north. At 3:12 a.m., another vehicle approached; although the actual collision could not be seen because of the vehicle blocking the roadway, the second vehicle could be seen leaving the roadway. Emergency personnel arrived at 3:38 a.m. Sabo testified that the video confirmed that two separate crashes had occurred in the early morning hours of July 25, 2021, on Schiller Road.

{¶ 8} Ohio State Highway Patrol Sergeant David Slanker testified that he responded to the scene on Schiller Road and learned that the SUV had been reported stolen; he proceeded to the address of the registered owner, Murphy, with Liming. Slanker testified that Murphy had had difficulty waking up, had appeared disoriented and off-balance as she came downstairs, and she "gave the indications or some appearance

of impairment." Murphy told Slanker that she had come home earlier and learned that her SUV had been stolen. Slanker noticed abrasions and redness around Murphy's face, which she told him were from waxing the areas. Slanker stated that in his experience, the abrasions of Murphy's face were consistent with the deployment of an airbag, and that Murphy also had abrasions on her right arm that were consistent with a collision. He did not conduct field sobriety tests or blood tests while at Murphy's home because a significant amount of time had elapsed between the collision and his contact with her.

{¶ 9} Trooper Rachel Simmons of the Ohio State Highway Patrol Investigative Section responded to the Schiller Road scene after being contacted by Sergeant Slanker. Simmons spoke to Charles Aiple, Murphy's husband, at the scene. Aiple stated that he had been out looking for the SUV, which reportedly had been stolen from his residence, when he came upon the crash scene. Simmons proceeded to Murphy's residence and interviewed her; a video of the interview with Murphy was played for the jury. Simmons testified that Murphy's DNA was later found on the airbag, that Murphy's vehicle had contained a six-pack of beer, and that Murphy's home was about a mile from the scene of the collision.

{¶ 10} Jeremiah Smith, a sergeant in the Crash Reconstruction Section of the Ohio State Highway Patrol, testified that he was contacted to assist in the investigation of the Schiller Road collisions on July 26, 2023. He identified his Crash Reconstruction and Analysis Unit Assistance Report. Smith detailed his investigation, and he testified that there were two collisions on Schiller Road. Smith's report stated:

Through the investigation, the crash was determined to be two separate crashes. As viewed on footage from a business surveillance camera, the Ford [SUV] is seen travelling west on Schiller Road when its headlights are seen diverted from the road and toward the camera. The on[-]scene evidence shows the Ford went off the side of the road and struck a utility pole. Post impact, the Ford rotated out into the roadway and became stationary partially in the east and westbound lanes of travel. A short time later, the headlights are seen to go out on the vehicle. Soon after, the Chevrolet [truck] is seen traveling east on Schiller Road and, subsequently, striking the Ford. The Ford was rotated back into the westbound lane. The Chevrolet went off the right side of the road and into a ditch. * * *

{¶ 11} Montgomery County Deputy Coroner Anna Castiglione Richmond performed an autopsy on the truck's driver, who was 41 years old at the time of his death. The driver's alcohol level was three and a half times the legal limit, and Richmond attributed his cause of death to drowning.

{¶ 12} Murphy presented no witnesses in her defense. At the conclusion of the State's evidence, Murphy moved for an acquittal, arguing in part that she should have been charged pursuant to R.C. 4549.03,[1] which governs a motor vehicle accident

---

[1]"The driver of any vehicle involved in an accident resulting in damage to real property, or personal property attached to real property, legally upon or adjacent to a public road or highway immediately shall stop and take reasonable steps to locate and notify the owner or person in charge of the property of that fact, of the driver's name and address, and of the registration number of the vehicle the driver is driving and, upon request and if available, shall exhibit the driver's or commercial driver's license." R.C. 4549.03(A).

resulting in damage to realty.   The court overruled the motion.

{¶ 13} Murphy argues that the State chose not to indict her pursuant to R.C. 4549.03, which by its language clearly applied to the allegations in this case.   She argues that R.C. 4549.02 requires a violation to involve a collision with another vehicle that is on a public road or a person (pedestrian or cyclist) on a public road; according to Murphy, a collision with and/or damage to a telephone pole adjacent to a public road does not support a conviction under R.C. 4549.02.

{¶ 14} The State responds that the authorities cited by Murphy in her brief "almost exclusively" involved damage to a "roadside fixture" in which the striking vehicle remained off the roadway, whereas Murphy's collision ended with the vehicle "blocking almost the entire roadway for both directions of travel."   The State acknowledges that *State v. Ragonesi*, 1st Dist. Hamilton No. C-190528, 2020 Ohio App. LEXIS 4318 (Nov. 18, 2020), upon which Murphy relies, is analogous to the facts of this case in that the driver in that case hit a utility pole and was "partially blocking one lane of travel."   But it argues that the First District's analysis in *Ragonesi* was "too narrow" to apply in this case because although Murphy's collision occurred off the roadway, "the accident as a whole started and ended on the road."

{¶ 15} The State asserts that there are two types of incidents that require someone to remain at the scene pursuant to R.C. 4549.02: a "motor vehicle accident" *or* a "collision with persons or property on a public road or highway."   The State notes the following definitions contained in the Revised Code:

1)      " 'Motor vehicle accident' means any accident involving a motor

vehicle" (R.C. 2930.01);

2) " 'Motor vehicle accident' means any accident involving a motor vehicle which results in bodily injury to any person, or damage to the property of any person" (R.C. 3937.41(A)(5)); and

3) " 'Accident' or 'motor vehicle accident' means any accident involving a motor vehicle which results in bodily injury to or death to any person, or damage to the property of any person in excess of four hundred dollars" (R.C. 4509.01(J)).

According to the State, the "incident" herein satisfied all three definitions.

{¶ 16} The State also directs our attention to R.C. 4775.01(B), which defines "collision" as "an occurrence in which two or more objects, whether mobile or stationary, contact one another in a manner that causes the alteration of the surface, structure, or appearance, whether separately or collectively, of an object that is a party to the occurrence." According to the State, the definition of an accident is broader than that of a collision, because unlike an accident, a collision requires "some sort of contact, or impact, in order to take place." The State argues that the phrase "with persons or property" in R.C. 4549.02 modifies "collision," and not "motor vehicle accident," such that "the collision must be with persons or property in order for the duty to remain to attach." In other words, every "collision is an accident, but not every accident has a collision."

{¶ 17} The State further argues that here, "a collision absolutely took place," because Murphy's "accident as a whole" commenced when she lost control of her vehicle on the public roadway and did not end until her vehicle came to rest back on the roadway.

According to the State, to conclude that Murphy was not guilty "because the collision took place off the roadway," such that no duty to remain at the scene arose, would yield an absurd result. The State argues that the General Assembly surely could not have intended the language of this statute to allow crashed vehicles to be abandoned in the middle of the road, and that the "secondary crash" that killed another driver resulted from Murphy's leaving the vehicle in the road.

{¶ 18} The State also cites *State v. McGraw*, 4th Dist. Ross No. 08CA3009, 2008-Ohio-6134, which agreed with the conclusion in *State v. Osborne*, 8th Dist. Cuyahoga No. 88453, 2007-Ohio-3267, that the legislature "deliberately chose the word "results" instead of "cause" in defining the third-degree felony version of the offense for situations in which the failure to stop "results" in the death of a person, "because it intended to encompass R.C. 4549.02(A) violations that did not necessarily physically cause the person's death, but rather bore a logical relation to the person's death." *McGraw* at ¶ 11. According to the State, given the weather and lack of lighting on the night of the crash, it was a logical consequence of Murphy's failure to stop and departure from the scene that another motorist struck her vehicle and that the "secondary crash" caused harm or death.

{¶ 19} Murphy's first assignment of error argues that her conviction for failure to stop was supported by insufficient evidence and was against the manifest weight of the evidence. Our standard for reviewing these arguments is as follows.

{¶ 20} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 21} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 22} R.C. 4549.02 governs stopping after an accident and the exchange of identity and vehicle registration. It states:

(A)(1) In the case of a motor vehicle accident or collision with persons or property on a public road or highway, the operator of the motor vehicle, having knowledge of the accident or collision, immediately shall stop the operator's motor vehicle at the scene of the accident or collision. The operator shall remain at the scene of the accident or collision until the operator has given the operator's name and address and, if the operator is

not the owner, the name and address of the owner of that motor vehicle, together with the registered number of that motor vehicle, to all of the following:

(a) Any person injured in the accident or collision;

(b) The operator, occupant, owner, or attendant of any motor vehicle damaged in the accident or collision;

(c) The police officer at the scene of the accident or collision.

* * *

(B)(1) Whoever violates division (A) of this section is guilty of failure to stop after an accident.   Except as otherwise provided in division (B)(2) or (3), failure to stop after an accident is a misdemeanor of the first degree.

* * *

(3) If the accident or collision results in the death of a person, failure to stop after an accident is whichever of the following is applicable:

(a) Except as provided in division (B)(3)(b) of this section, a felony of the third degree;

* * *

(4)   In all cases, the court, in addition to any other penalties provided by law, shall   impose upon the offender a class five suspension of the offender's driver's * * * from the range specified in division (A)(5) of the Revised Code. * * *

{¶ 23}   Most of the cases reviewing R.C. 4549.02(A) refer to the statute as the "hit

skip" or "hit-and-run" statute. *State v. Provino*, 175 Ohio App.3d 283, 2007-Ohio-6974, 886 N.E.2d 888, ¶ 12; *see also State v. Johnson*, 9th Dist. Summit No. 22789, 2006-Ohio-2277; *N. Olmstead v. Gallagher,* 2 Ohio App.3d 414, 442 N.E.2d 470 (1981)." Those cases "all involve situations where the defendant strikes a pedestrian, a person riding a bike, or another vehicle where people are injured." *Provino* at ¶ 12.

{¶ 24} "Under R.C. 4549.02(A), a driver involved in an accident is required to remain on the scene until she has given her name and identifying information to the driver of the other vehicle or to a police officer." *State v. Jones*, 1st Dist. Hamilton No. C-140299, 2015-Ohio-1189, ¶ 7. R.C. 4549.02(A) "is designed to facilitate the investigation into accidents," and it is " 'aimed at prohibiting a driver from "failing to stop and give his name and address after operating a vehicle that is involved in a collision on a public road." ' " *Id.* "Elevating the penalty to a felony offense advances 'the legitimate governmental interest in punishing more severely those who flee the scene of a grave and serious accident versus those who may flee from striking a parked, unoccupied car.' *State v. Presley*, 2013-Ohio-3762, 995 N.E.2d 256, ¶ 13 (2d Dist.)." *Id.* at ¶ 8.

{¶ 25} In *Provino*, the appellant driver slid off the road in icy and snowy conditions into a ditch and left the vehicle. *Provino* at ¶ 2. In reversing appellant conviction for a misdemeanor violation of R.C. 4549.02(A), *Provino* cited *State v. Spence*, 12th Dist. Clermont No. CA2002-02-012, 2002-Ohio-3600, ¶ 12, which held that the explanation of circumstances on Spence's no contest plea was insufficient to support a conviction where Spence lost control of a friend's vehicle, struck a utility pole, and walked to the home of the owner of the vehicle. *Spence* at ¶ 3. *Spence* noted that "[b]y its very terms, R.C.

4549.02 provides that any accident subject to the section involves a collision with either a pedestrian or another motor vehicle," and there was no accident or collision involving a pedestrian or another vehicle in that case. *Id.* at ¶ 12. Thus, Spence's conviction for failure to stop was vacated.

{¶ 26} Further, in *State v. Teeple*, 3d Dist. Seneca No. 13-17-28, 2018-Ohio-1767, ¶ 23, the court, citing *Spence* and *Provino*, found that the evidence in the record was insufficient to prove the necessary elements of failure to stop under R.C. 4549.02(A). In the incident at issue, Teeple had gone off the roadway into a ditch and then struck a road sign. The Third District found that the record did not contain any evidence that Teeple's accident occurred "on a public road or highway" as required by the "first prong" of R.C. 4549.02. *Id.* at ¶ 20. Regarding the "second prong," *Teeple* noted that there was no evidence suggesting that Teeple had been involved "in an *injury* accident" and, because his vehicle was the only vehicle involved in the accident, he had had "no duty to notify himself of the accident." (Emphasis sic.) *Id.* at ¶ 21.

{¶ 27} In *State v. Schwieterman,* 2d Dist. Greene No. 2023-CA-14, 2023-Ohio-2613, a vehicle driven by Schwieterman collided with a bicycle operated by a cyclist. *Id.* at ¶ 4. The cyclist was knocked off his bike, and it landed on top of him. *Id.* On appeal, the State conceded that R.C. 4549.02(A)(1)(b) and (c) were not applicable because the bicycle was not a motor vehicle and no police officer was present when Schwieterman left the scene. *Id.* at ¶ 15, citing *State v. Bryant*, 160 Ohio St.3d 113, 2020-Ohio-1041, 154 N.E.3d 31, ¶ 20. Schwieterman conceded on appeal that he had known of his collision with the bicycle, had known that the cyclist had been injured, and

had left without giving the cyclist the identifying information referenced in the statute. *Id.* On appeal, we concluded that "a rational trier of fact could have found Schwieterman guilty of violating R.C. 4549.02(A)(1)(a)" under these circumstances. *Id.* at ¶ 20.

{¶ 28} Finally, in *Ragonesi*, 1st Dist. Hamilton No. C-190528, 2020 Ohio App. LEXIS 4318, which is discussed by both parties, the First District reversed Ragonesi's conviction under to R.C. 4549.02; it concluded that the conviction was not supported by sufficient evidence because "the state failed to prove that the collision occurred on a public road or highway." *Id.* at *5-6. We note that R.C. 4511.01(BB) defines street or highway as "the entire width between the boundary lines of every way open to the use of the public as a thoroughfare for purposes of vehicular travel," and R.C. 4511.01(EE) defines roadway as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, except the berm or shoulder." *See State v. Frankart,* 3d Dist. Seneca No. 13-15-03, 2015-Ohio-2737, ¶ 36 (noting that "the definitions in R.C. 4511.01 * * * limit the street/highway/roadway to the area used for vehicular travel, and the definition for 'roadway' excludes the 'berm or shoulder.' ").

{¶ 29} In *Ragonesi,* a Lyft driver observed the taillights of Ragonesi's car "off the left-hand side" of a road in the early morning hours of February 2019. *Id.* at *2. The Lyft driver stopped her vehicle and approached Ragonesi's, which was unoccupied; she observed that the front of the vehicle had hit a pole, and the vehicle was smoking. *Id.* A deputy sheriff arrived and noticed that Ragonesi's vehicle was "resting halfway in the main roadway. It was totaled, and its airbag had been deployed." *Id.* at *3. The deputy determined that the driver had failed to stop at a stop sign, had lost control of the

car, had gone off the roadway, and had struck the telephone pole." *Id.* Ragonesi was charged with "leaving the scene of the accident" under R.C. 4549.02. *Id.* at *4.

{¶ 30} Ragonesi moved for a judgment of acquittal at the conclusion of the State's evidence, and her motion was overruled. She presented the testimony of a resident of the road where the accident occurred; the resident and her husband had heard Ragonesi's cries for help, had found her crying next to her car, and had brought her into their home due to the bitter cold. *Id.* Upon returning to the accident scene to look for Ragonesi's phone, the nearby resident encountered the Lyft driver, who had already called the police. The resident returned to her home to await the arrival of law enforcement. *Id.*

{¶ 31} At trial, Ragonesi relied upon *State v. Clark*, 5th Dist. Stark No. 7544, 1988 WL 142297 (Dec. 28, 1988), which found insufficient evidence to support a conviction pursuant to R.C. 4945.02 where a defendant's vehicle had skidded down a street and struck a utility pole owned by Ohio Power, and the "property allegedly damaged was property not on a public road or highway but private property." Ragonesi further relied upon *State v. Cutlip*, 9th Dist. Summit No. 28735, 2018-Ohio-726, in which the defendant "crashed into a mailbox and a ditch," allegedly in violation of an ordinance identical to R.C. 4549.02(A). *Id.* at *9. The Ninth District in *Cutlip*, citing *Clark*, determined:

> Under the plain language of the ordinance, the accident or collision must occur on a public roadway. * * * In this case the only collisions occurred off the roadway * * *. Although not every "accident" requires a collision, Mr. Cutlip's mere failure to control his vehicle on the roadway did

not constitute an accident. * * * We note the term "accident" is not defined in Macedonia's Codified Ordinances. If a word is not defined in an ordinance, it will be given its common and ordinary meaning. * * * The term "accident" ordinarily means "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." *Black's Law Dictionary* 15 (8th Ed. 2004).

*Id.* at ¶ 10.

{¶ 32} *Ragonesi* concluded that the State had failed to show that the collision with persons or property occurred on a public road or highway. The evidence unequivocally showed that Ragonesi's car collided with a telephone pole off the side of the roadway, and the fact that part of the car remained in the roadway was irrelevant. *Id.* at *8. According to the First District, Ragonesi had simply been charged under the wrong statute, and the State had never sought to amend the complaint. *Id.* at *8-9.

{¶ 33} Having reviewed the entire record and considered the evidence in a light most favorable to the State, we agree with Murphy that her conviction pursuant to R.C. 4549.02 was not supported by sufficient evidence and was against the manifest weight of the evidence. The evidence was clear that two distinct collisions occurred: Murphy's SUV left Schiller Road, a public roadway, and collided with the utility pole; Murphy then left the scene, leaving the SUV behind. Under these circumstances, we cannot conclude that the incident herein involved "a motor vehicle accident or collision with persons or property on a public road or highway" pursuant to the plain language of R.C. 4549.02(A)

and the above authorities which triggered a duty on Murphy's part of to remain at the scene. Murphy also did not leave the scene of a "grave and serious accident." While the State characterizes the impact of the truck with Murphy's SUV as a "secondary crash" subject to the statute, R.C. 4549.02 is silent as to such a subsequent event. We further conclude that Murphy's collision with the pole was not injurious within the meaning of R.C. 4549.02(A)(1)(a), as there was no other person injured when Murphy struck the pole.

{¶ 34} Finally, R.C. 4549.02(b) and (c) are expressly addressed to the provision of the identity and vehicle registration by "the operator of the motor vehicle, having knowledge of the accident or collision," to the owner or operator of any vehicle damaged in the accident or to police at the scene. No other motor vehicle was damaged in Murphy's accident or collision, and there was not a police officer at the scene immediately after Murphy struck the pole. We cannot conclude that the tragic fact that the truck subsequently struck Murphy's SUV brought the matter within the ambit of R.C. 4549.02. In other words, in leaving the scene, Murphy did not violate the statute.

{¶ 35} For the foregoing reasons, Murphy's first assignment of error is sustained.

{¶ 36} Murphy's second assignment of error is as follows:

THE TRIAL COURT ERRED IN SENTENCING MS. MURPHY TO 54 MONTHS IN PRISON.

{¶ 37} Under her second assignment of error, Murphy argues that she should not have been sentenced to consecutive terms of imprisonment. Having sustained Murphy's first assignment of error, Murphy's second assignment of error is moot.

{¶ 38} Based upon the foregoing, the judgment of the trial court is reversed as to

the failure to stop offense; the matter will be remanded to the trial court for it to file an amended judgment entry that eliminates the conviction for this offense, including the three-year license suspension imposed as a result of this offense.   The judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.